**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GLORIA A.,

                Claimant,

      v.

ANDREW SAUL, Commissioner
of Social Security,

                Respondent.

No. 18 CV 5802

Magistrate Judge Jeffrey T. Gilbert

**MEMORANDUM OPINION AND ORDER**

Claimant Gloria A.[1] ("Claimant") seeks review of the final decision of Respondent Andrew Saul,[2] Commissioner of Social Security ("Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"). Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [ECF No. 7]. The parties have filed cross-motions for summary judgment [ECF Nos. 16, 22] pursuant to Federal Rule of Civil Procedure 56, and this Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). For the reasons discussed below, Claimant's Motion for Summary Judgment [ECF No. 16] is granted in part and denied in part, and the Commissioner's Motion [ECF No. 22] is granted in part and denied in part.

---

[1] Pursuant to Northern District of Illinois Local Rule 8.1 and Internal Operating Procedure 22, the Court will identify the non-government party by using his or her full first name and the first initial of the last name.

[2] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019. Pursuant to Federal Rule of Civil Procedure 25(d), the Court has substituted Commissioner Saul as the named defendant.

## PROCEDURAL HISTORY

On November 3, 2014, Claimant filed a Title II application for DIB benefits and a Title XVI application for SSI benefits, both alleging disability beginning on March 31, 2012. (R. 181-184). Both claims were denied initially and upon reconsideration, after which Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (R. 157-164, 167-176). On March 22, 2017, Claimant appeared and testified at a hearing before ALJ Jose Anglada. (R. 38-86). The ALJ also heard testimony on that date from vocational expert ("VE") Tammie Donaldson. (R. 78-85).

On June 22, 2017, the ALJ denied Claimant's claim for DIB and SSI after considering her limitations. (R. 13-32). In finding Claimant not disabled, the ALJ followed the five-step evaluation process required by Social Security regulations for individuals over the age of 18. See 20 C.F.R. § 416.920(a). At step one, the ALJ found that although Claimant engaged in some work after her alleged disability onset date, this work did not rise to the level of substantial gainful activity. (R. 15). At step two, the ALJ found that Claimant had a severe impairment or combination of impairments as defined by 20 C.F.R. 404.1520(c) and 416.920(c). (R. 16). Specifically, Claimant had status-post cerebrovascular insult in September 2014 and January 2015, resulting in decreased clarity of speech and reported cognitive defects, but no residual motor deficits persisting for at least three consecutive months. (R. 15-16). Claimant also had coronary artery disease, with myocardial infarction and angioplasty with a 30 percent residual stenosis of the artery, in December 2013, and further suffered from diabetes and hypertension. (R. 15-16). The above-noted severe impairments, according to the ALJ, significantly limit Claimant's ability to perform basic work activities. (R. 16).

The ALJ also noted that Claimant had several non-severe impairments, including that Claimant was overweight, though not obese, and that Claimant had broken her foot sometime in

June 2016. (R. 16). The ALJ further acknowledged that Claimant reported "brief bouts with symptoms" associated with depression and anxiety in 2012 but explained that he did not consider these symptoms a severe impairment because of their limited duration. (R. 16). Finally, the ALJ considered that the Claimant alleged difficulty using her left upper extremity and had regular complaints of left arm pain but concluded that the weight of the evidence did not establish that the pain in Claimant's left arm had lasted at least twelve consecutive months. (R. 16-17). In particular, the ALJ noted that the record showed only isolated incidents where Claimant complained of left arm pain or demonstrated clinical abnormality in her left arm before ultimately deciding that Claimant's left arm limitations did not meet the durational requirement to be considered a severe impairment. (R. 16-17).

At step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17). Specifically, the ALJ noted that Claimant did not meet or medically equal the criteria of listings 4.04 (ischemic heart disease) or 11.04 (vascular insult to the brain), nor did she meet the requirements of Section 4.00H1 (hypertension). (R. 17-18). The ALJ further considered the severity of Claimant's mental impairment and determined that it did not meet the criteria of listing 12.02 (neurocognitive disorders) because Claimant satisfied neither paragraph "B" nor paragraph "C" criteria. (R. 18). Although the ALJ ultimately concluded Claimant did not meet the criteria of any severe impairments described above, he did note that Claimant had mild limitations in understanding, remembering, or applying information and moderate limitations in concentrating, persisting, or maintaining pace. (R. 17-19).

The ALJ then found Claimant had the residual functional capacity[3] ("RFC") to:

"perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) in that the claimant would be able to lift and carry twenty pounds occasionally and ten pounds frequently, and that the claimant would be able to stand and walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. However, the claimant would be unable to work at heights, climb ladders, or frequently negotiate stairs. She would be able to only occasionally balance, stoop, crouch, kneel, or crawl. She should avoid operation of moving or dangerous machinery. She would be limited to simple, routine tasks, involving no more than simple, short instructions, and requiring her to making [sic] no more than simple, work-related decisions." (R. 19).

Based on this RFC, the ALJ found at step four that Claimant had past relevant work as a cleaner/polisher, as well as an electrical assembler. (R. 32). After weighing Claimant's testimony, earning records, and other evidence, including the VE's testimony, the ALJ concluded that Claimant was capable of returning to that previous work "as actually and generally performed." (R. 32). According to the ALJ, Claimant's residual functional capacity did not preclude her from meeting the physical and mental demands of her prior work. (R. 32).

Finally, at step five, the ALJ did not determine whether, considering Claimant's age, education, past work experience, and residual functional capacity, she is capable of performing any other work within the national economy because he had concluded that Claimant was capable of doing her past relevant work. (R. 32). The ALJ then found Claimant was not disabled under the Act. (R. 32). The Appeals Council declined to review the matter on June 21, 2018 (R. 1-3), making the ALJ's decision the final decision of the Commissioner and, therefore, reviewable by this Court. 42 U.S.C. § 405(g); *see, e.g., Smith v. Berryhill,* 139 S. Ct. 1765, 1775 (2019); *Haynes v. Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005).

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite [her] mental and physical limitations." *Craft v. Astrue,* 539 F.3d 668, 675–76 (7th Cir. 2008).

4

## STANDARD OF REVIEW

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Judicial review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his or her decision. *See Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted); *see also, Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Biestek,* 139 S. Ct. at 1154; *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even where there is adequate evidence in the record to support the decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (internal quotations omitted). In other words, if the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008) (internal quotations omitted). The reviewing court may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## ANALYSIS

### I.    Claimant's Mental Limitations and the RFC

Claimant first argues that the ALJ did not adequately incorporate Claimant's mental limitations – namely, her reported confusion and decreased clarity of speech – into the RFC and should have "called upon a medical expert" to clarify purported gaps in the medical evidence regarding the same. [ECF No. 16] at 6-7. She relatedly asserts that the ALJ failed to sufficiently account for her moderate limitations in concentration, persistence and pace, which were based on Claimant's confusion and impaired speech, in both the RFC assessment and hypothetical questions posed to the VE. [ECF No. 16] at 7-9. The Court disagrees that it was necessarily incumbent upon the ALJ to seek additional medical evidence regarding Claimant's mental limitations, but nevertheless finds that the ALJ did not adequately provide a "logical bridge" between Claimant's mental limitations, which were supported by substantial evidence in the record, and the limitations ultimately contained in the RFC and presented to the VE through hypothetical questions at the hearing. The Court therefore remands for further development of this limited issue, as explained below.

The Court turns first to Claimant's contention that the medical evidence was unclear as to Claimant's mental limitations and "at minimum the ALJ should have called upon a medical expert to assess this evidence" or re-contacted Claimant's treating physicians before formulating the RFC. [ECF No. 16] at 7. Although the ALJ does have a duty to develop a develop a full and fair record, *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009), it is Claimant's burden, not the ALJ's, to prove she is disabled. *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017) (citing *Meredith v. Bowen*, 833 F.2d 650, 655 (7th Cir. 1987); 20 C.F.R. § 404.1512(a)(1)). Particularly where the Claimant was represented by counsel during the proceeding, as here, courts give "deference to an

ALJ's decision about how much evidence is sufficient to develop the record fully and what measures (including additional consultative examinations) are needed in order to accomplish that goal." *Poyck v. Astrue*, 414 F. App'x 859, 861 (7th Cir. 2011) (citing *Nelms*, 553 F.3d at 1098; *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir.1993)); *see also, Glenn v. Sec'y of Health and Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987) ("The ALJ is entitled to assume that a claimant represented by counsel 'is making his strongest case for benefits.'"). Based on the evidence before the Court, the ALJ did not abuse his discretion when he determined that it was not necessary to follow-up with Claimant's treating physicians or request additional consultative examinations. The ALJ had the benefit of several years of detailed treatment notes from Claimant's physicians and other medical contacts, including fulsome evaluations by neurologists and other specialists, when he formulated Claimant's RFC. The ALJ was therefore entitled to conclude that the evidence in the record was sufficient to render a full and fair opinion and craft an RFC tailored to Claimant's particular limitations.

Although there was enough medical and other evidence in the record for the ALJ to formulate Claimant's RFC, the matter of whether that RFC and the hypothetical questions posed to the VE ultimately captured all of Claimant's mental limitations is a different question. It is well-established that all of a claimant's limitations must be incorporated into both the hypothetical posed to the VE and the ALJ's RFC assessment. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). Specifically, the hypothetical must account for documented limitations of "concentration, persistence or pace." *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004). "Though an RFC assessment need not recite the precise phrase 'concentration, persistence, or pace,' any alternative phrasing must clearly exclude those tasks that someone with the claimant's limitations could not perform." *Paul v. Berryhill*, 760 F. App'x 460,

465 (7th Cir. 2019) (citing *Moreno v. Berryhill*, 882 F.3d 722, 739 (7th Cir. 2018)). Recent cases from the Seventh Circuit have cautioned that in most cases, "employing terms like simple, repetitive tasks on their own" may not be enough to account for a claimant's limitations in concentration, persistence, and pace. *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019). Indeed, this Court has remanded on more than one occasion because an RFC limiting a claimant to simple, routine and repetitive tasks and simple work-related decisions did not adequately capture a claimant's mental limitations. *Tyronda B. v. Saul,* 2020 WL 4464673 (N.D. Ill. 2020); *Webb v. Colvin,* 2015 WL 9474289 (N.D. Ill. 2015). But as this Court and the Seventh Circuit also have emphasized, the determination as to whether an RFC limited to simple, routine, and repetitive tasks accounts for deficits in concentration, persistence, and pace must be made on a case-by-case basis because limiting the claimant to these tasks may very well accommodate the claimant's particular needs. *Jozefyk v. Berryhill*, 923 F.3d 492, 497-98 (7th Cir. 2019) (where claimant's impairments only surfaced in social settings, the ALJ did not err in limiting claimant to "simple, routine, repetitive tasks" that required limited-to-no social interaction); *Dudley v. Berryhill*, 773 F. App'x 838, 842 (7th Cir. 2019) (holding limitation to "simple, routine and repetitive tasks" and "work requiring the exercise of only simple judgment" accommodated claimant's stress and panic related impairments and concentration difficulties).

In this case and as described above, the ALJ determined at step two that one of Claimant's severe impairments was status-post cerebrovascular insult in September 2014 and January 2015. (R. 15). Although this impairment did not result in any residual motor deficits persisting for at least three consecutive months, the ALJ emphasized that Claimant did suffer from decreased clarity of speech and reported cognitive defects as a result. (R. 15-16). In turn, these speech impairments and cognitive issues limited Claimant's ability to understand, remember, or apply

information, as well as to concentrate, persist, or maintain pace, to varying degrees. When assessing the "paragraph B" criteria, the ALJ concluded that Claimant's mental limitations impacted her ability to understand, remember, or apply information as follows:

> "Although the claimant alleged that she experienced confusion and poor memory (*see* Ex. B2F, p. 9), the weight of the evidence in the record does not support more than a mild degree of impairment in this domain. While there was some clinical evidence of confusion, and tangentiality of speech (*see* Ex. B4f, p.8; *see also* Ex. B7F, p. 28), there was no memory testing in the record showing impaired memory, the claimant did not receive neurocognitive treatment for impaired memory, and she was reportedly able to perform activities of daily living, including cooking, cleaning, and helping on her nephew's farm. Furthermore, the claimant's allegations of confusion were not consistent throughout the record. (*See* Ex. B12F, p. 10)." (R. 18).

In assessing Claimant's ability to interact with others, the ALJ gave another nod to the existence of Claimant's speech impairment but ultimately concluded that Claimant's evidence of daily living – that she was able to maintain friendships, live with other people, and take public transportation – showed that Claimant did not have any limitation in interacting with others. Claimant's ability to concentrate, persist, or maintain pace, however, was more severely affected by Claimant's speech, memory, and cognitive issues and caused moderate limitations:

> "With regard to concentrating, persisting, or maintaining pace, the claimant has moderate limitations. Significantly the claimant demonstrated tangential speech at times (*see* Ex. B7F; B12F), and decreased clarity of speech, which evidences some degree of impairment in this domain. However, the other evidence in the record showed that the claimant was able to engage in a number of activities, including helping out on her nephew's farm, traveling to Mexico at least twice, and performing her activities of daily living. Overall, giving the claimant's allegations some benefit of the doubt, I find that the claimant has a moderate limitation in this domain." (R. 19).

As described above and throughout the ALJ's opinion, Claimant's greatest limitations in the area of concentration, persistence, and pace are memory and speech related. To purportedly accommodate these specific issues, the ALJ limited Claimant to "simple, routine tasks, involving no more than simple, short instructions, and requiring her to making [sic] no more than simple, work-related decisions" and to "avoid[ing] operation of moving or dangerous machinery" (R. 19).

The ALJ intended that the restriction on operating moving or dangerous machinery would accommodate some of Claimant's speech issues:

> "Because of the claimant's reduced mobility, and her decreased clarity of speech, I find that she would be unable to work in a job that would expose her to the operation of moving or dangerous machinery; she would have difficulty warning other employees of dangers associated with these hazard, and her reduced mobility would make it difficult to avoid the hazards posed by these types of machines." (R. 30).

The ALJ further attempted to address Claimant's speech and cognitive limitations by limiting Claimant to simple, work-related decisions, as the ALJ believed such a limitation would help Claimant avoid complicated verbal workplace interactions with either co-workers or supervisors. The ALJ explained his reasoning as follows:

> "Finally, because of her reported confusion and decreased clarity of speech, she would be limited to jobs consisting of simple work-related decisions; significantly, the evidence does not show that the claimant would be unable to handle the degree of complexity involved in a simple, routine task, and because these jobs would require no more than simple, short instructions and simple, work-related decisions, any communication needed in this job would not be significant[ly] affected by the claimant's decreased clarity of speech, as she would not have to ask complicated questions of her co-workers or supervisors, and would not be in a position to give complicated or complex orders/instructions to others." (R. 30).

The ALJ clearly credited the subjective and objective evidence in the record that Claimant in fact suffered from speech and memory-related cognitive limitations and found that these limitations would impact her ability to work to varying degrees. (R. 15, 18-19). This Court agrees and finds that Claimant's limitations in these areas and the impact they would have on her ability to work were supported by substantial evidence. Claimant specifically complained of confusion, poor memory, and tangentiality of speech or difficulty finding words as a result of three strokes she says she suffered during the alleged period of disability. And particularly towards the end of 2014 and continuing through to the present, Claimant's subjective complaints are well-supported by the medical evidence of record and appear to be worsening over time. On October 1, 2014, Claimant presented to MacNeal Hospital with altered mental status or confusion. At that time, both

10

Claimant's husband and son noted that she was experiencing difficulties with her speech and finding words. (R. 695, 701, 703). Her clarity of speech eventually improved during her three-day stay at the hospital, but there was evidence in the record that Claimant had suffered a subacute stroke of her frontal and left temporal regions and that she was still experiencing some speech issues as she neared her discharge date, for which Claimant's treating physicians recommended future speech therapy. (R. 701, 704-706). On November 17, 2014, Claimant was interviewed by a Social Security claims representative and was noted to have difficulty remembering and answering the questions. (R. 324). In particular, the interviewer noted that Claimant had difficulty during the interview with understanding, coherency, concentrating, talking, and answering. (R. 324).

Two months later, on January 15, 2015, Claimant again visited MacNeal Hospital experiencing worsening slurred speech and confusion. (R. 626). Neurologists that treated Claimant noted that she had previously been treated for similar speech and neurological concerns in 2014 and described that some signs of confusion were present during Claimant's physical examination. (R. 626, 630-32). On June 4, 2015, Claimant again exhibited tangential speech and was both difficult to follow and difficult to direct during an examination at Alivio Medical Center. (R. 799-805). Again, on June 11, 2015, (R. 791-98), and October 16, 2015, (R. 777-784), Claimant visited Alivo Medical Center experiencing the same.

On November 10, 2015, Dr. Dante Pimental, M.D. performed an internal medicine consultative examination on Claimant that did not document any abnormalities in Claimant's speech or memory. (R. 806-12). However, on March 26, 2016, Claimant again visited Alivio Medical Center, presented with tangential speech, and was difficult to follow and direct. (R. 913). Only a few months later, in May of 2016, she returned to the emergency room because she suddenly was unable to talk or move her right hand. (R. 825). She communicated with medical

11

staff only by nodding her head and was admitted to the ICU at that time. (R. 825). Claimant was not fully oriented during her initial examinations and could not offer any usable speech or auditory comprehension. (R. 833-34). She regained her speech during a five-day hospitalization, (R. 834, 868), but about a week and a half later, the medical records from a follow-up visit show she was still experiencing difficulty with word-finding, foggy thoughts, and that her clarity of speech had worsened as a result of the suspected stroke or seizure. (R. 825, 922). Finally, the medical evidence closest in time to Claimant's hearing before the ALJ – during a visit to Alivio Medical Center on July 21, 2016 – showed that Claimant's decreased clarity of speech persisted. (R. 933). Records from Claimant's visit show that doctors were concerned that Claimant was experiencing some cognitive difficulties, either in the form of an intellectual delay or a residual stroke disability, (R. 932), and that Claimant's speech was worsening over time. (R. 933).

Based on the above descriptions of Claimant's mental limitations in the record, which were reviewed and acknowledged by the ALJ, it is not self-evident that restricting Claimant to simple, routine tasks here reasonably accommodated Claimant's moderate limitations in concentration, persistence, and pace, or her mild limitations in understanding, remembering, or applying information in a workplace setting. *Mischler v. Berryhill,* 766 F. App'x 369, 376 (7th Cir. 2019) ("simple routine and repetitive tasks in a low stress job…fails to account for the moderate difficulties in concentration, persistence, and pace") (internal quotations omitted); *DeCamp v. Berryhill,* 916 F.3d 671, 676 (7th Cir. 2019) ("we have 'repeatedly rejected the notion that a hypothetical…confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace.') (quoting *Yurt*, 758 F.3d at 858-59). Although the ALJ recognized Claimant's speech and cognitive deficiencies, he ultimately failed to build a logical bridge between the limitations he

himself acknowledged and the restrictions he imposed in the RFC. *Yurt*, 758 F.3d at 859 ("This failure to build an 'accurate and logical bridge' between the evidence of mental impairments and the hypothetical and the mental RFC requires us to remand for further proceedings."). That is, although the RFC and the hypotheticals given to the VE by the ALJ ostensibly accounted for Claimant's mental impairments by limiting her to simple, unskilled work, this restriction did not address the heart of Claimant's specific mental limitations. There is also no evidence in the record, nor did the ALJ explain, how Claimant's ability to concentrate or maintain pace depends on whether a task is simple or complicated again based on Claimant's particular impairments. *See, e.g., O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) ("it is not clear whether the hypothetical, which included a restriction to repetitive tasks with simple instructions, would cause the VE to eliminate positions that would pose significant barriers to someone with the applicant's depression-related problems in concentration, persistence, and pace."). Merely restricting Claimant to simple, routine tasks and avoiding dangerous machinery also does not account for Claimant's ability to concentrate on or perform particular tasks in a workplace environment given her documented mental confusion, tangential speech, foggy thoughts, and "cognitive deficits." (R. 15, 18-19).

Similarly, it is not clear to the Court that the RFC and the ALJ's hypothetical to the VE, which included only a restriction to "simple, routine tasks, involving no more than simple, short instructions" and "no more than simple, work-related decisions," speak at all to whether Claimant would be able to communicate with coworkers or members of the public when necessary given her speech-related limitations. So too is the evidence in the record ambiguous as to whether Claimant's mental limitations affected her ability to maintain pace, and in turn, whether any issues in maintaining pace would be addressed by limiting Claimant to simple, routine work. *Ramirez*,

372 F.3d at 554 (restriction to simple one or two-step tasks does not take into account deficiencies in pace where "[m]any employers require a certain output level from their employees over a given amount of time, and an individual with deficiencies in pace might be able to perform simple tasks, but not over an extended period of time.").

While a mild, or even a moderate, limitation in an area of mental functioning does not necessarily prevent Claimant from securing gainful employment, *Sawyer v. Colvin,* 512 F. App'x 603, 611 (7th Cir. 2013), the ALJ must still affirmatively evaluate the effect such mild limitations have on the Claimant's RFC. He did not do so here. As the Social Security Administration has explained, "[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job." SSR 85–15. There is no evidence here that altering the skill level of Claimant's position to simple, routine tasks would accommodate her particular verbal and cognitive difficulties, as an RFC for "unskilled" work by itself does not provide any information about Claimant's mental condition and how it might limit her ability to work. For this reason, and so that the ALJ can build a logical bridge between his acknowledgment of Claimant's mental limitations and the restrictions contained in the RFC, specifically her communication and speech deficits, remand is necessary.

On remand, the ALJ should take care to provide the VE with a complete picture of Claimant's conditions in determining her RFC. *Jelinek v. Astrue,* 662 F.3d 805, 813 (7th Cir. 2011). The hypothetical to the VE must include all of a claimant's limitations, including deficiencies of concentration, persistence and pace. *DeCamp*, 916 F.3d at 675; *Moreno*, 882 F.3d at 730. The easiest way to do that in this case, of course, would have been for the ALJ  simply to

14

ask the VE to consider a hypothetical person who, like Claimant, has a moderate limitation in concentration, persistence and pace, as well as a mild limitation in understanding, remembering, or applying information, and has exhibited confused and tangential speech. *O'Connor-Spinner*, 627 F.3d at 619. But the ALJ chose not to do this, which unfortunately leaves this Court to wonder whether the VE in fact took account of the extent of Claimant's mental limitations when she opined on the type of work Claimant was capable of undertaking. It may be that the VE conducted an independent review of the medical records or absorbed other testimony at the hearing that would have provided her with the necessary information to opine on the types of jobs available to Claimant, but there is no evidence in the record to support such a conclusion, and the Court cannot assume as much here. *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Claimant had well-documented struggles with clarity of speech and other cognitive issues, and a single, general statement from the VE that she "heard [Claimant's] testimony over the phone," (R. 72), does not convince this Court that the VE was acutely and particularly aware that Claimant suffered speech and memory issues that in turn affected her ability to concentrate, persist, and maintain pace, as well as her ability to understand, remember, or apply information in a workplace setting, and that the VE took those considerations into account in determining the work Claimant would be able to do. On remand, therefore, the hypothetical questions asked of the VE must include all information – and in particular, all information related to Claimant's mental limitations – necessary for the VE to make an accurate assessment.

## II.    Claimant's Physical Limitations and the RFC

Claimant next asserts that the ALJ did not account for her physical limitations in the RFC; in particular, her "left side weakness" and the allegation that she required a cane to ambulate. (R.

10-13). To the contrary, the ALJ specifically considered Claimant's left-side weakness and ambulatory limitations in formulating the RFC, and further supported those conclusions with substantial evidence from the medical record and Claimant's own subjective statements. The Court is therefore unconvinced that the ALJ erred in his evaluation of Claimant's physical limitations.

As generally discussed in Section I with regard to Claimant's mental limitations, the RFC is a measure of what an individual can do despite the limitations imposed by her impairments. 20 C.F.R. § 404.1545(a). It is "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities," *Id*., and must be supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt,* 758 F.3d at 857. An "ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). However, it is also true that "an ALJ need not mention every piece of evidence, so long as [she] builds a logical bridge from the evidence to [her] conclusion." *Id*. (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)).

The ALJ incorporated Claimant's physical limitations into the RFC as follows:

> "…claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) in that the claimant would be able to lift and carry twenty pounds occasionally and ten pounds frequently, and that the claimant would be able to stand and walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. However, the claimant would be unable to work at heights, climb ladders, or frequently negotiate stairs. She would be able to only occasionally balance, stoop, crouch, kneel, or crawl." (R. 19).

In explaining how the RFC adequately captured Claimant's physical limitations – namely, her complaints of left-side weakness and that she required a cane to ambulate – the ALJ took

16

particular note of Claimant's subjective testimony, medical evidence in the record, and Claimant's activities of daily living. As to Claimant's subjective statements, the ALJ examined and considered testimony from Claimant that she has limited mobility in her left shoulder and that she has "paralysis on the left side, due to her stroke." (R. 20). So too did the ALJ note Claimant's testimony that she "always uses a cane to ambulate, and that a doctor prescribed the cane two years ago." (R. 20). Indeed, the ALJ described that he was giving Claimant's allegations of "fatigue, decreased energy, and other symptoms some benefit of the doubt" in restricting Claimant to the RFC described above. (R. 31). However, "the ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009) (internal quotations omitted). And as described below, the ALJ made it clear that he did not find Claimant's symptoms to be as severe as Claimant testified. He was therefore justified in discounting Claimant's credibility regarding her left-side weakness and ambulatory limitations and was not required to include these specific limitations in his hypotheticals or in the RFC more than he did.

To that point, after assessing the medical and other evidence, the ALJ concluded that the severity of Claimant's subjective allegations of left-side weakness was not supported by the weight of the record. (R. 31). Specifically, the ALJ cited to multiple sources, including neurologists who examined Claimant and notes from other treating physicians, that showed Claimant consistently had normal range of motion and full strength in her left shoulder and arm. (R. 31, 611-12, 703-06, 893-94). She routinely demonstrated 5/5 strength through her left arm and had no noted difficulty in using her left arm for lifting, carrying, and handling. (R. 31, 611-12, 703-06, 893-94). The ALJ also emphasized that Claimant's activities of daily living did not support the degree of left-side weakness and ambulatory limitations at issue here, and to that point, the question of what a

claimant can do despite his limitations is exclusively within the ALJ's purview. See 20 C.F.R. § 416.927(d)(2) (noting that the final responsibility of crafting the RFC is reserved to the Commissioner); *Bates v. Colvin*, 736 F.3d 1093, 1102 n. 4 (7th Cir. 2013) (noting that an opinion regarding what a claimant can or cannot do in a given day is not a "medical opinion" to which the ALJ must defer). Claimant reported lifting furniture – specifically, a bed – at one of her emergency room visits in 2016, an activity that one would think necessarily would have involved her left arm, and also was able to cook, clean, sweep, and walk at least ten blocks at a time. (R. 21-22). She was further able to successfully take care of her nephew's cattle while living in Idaho, which included "grabbing a little cart and [bringing] the hay to the animals," (R. 60), and feeding the cows every day from 8 a.m. to 5 or 6 p.m. (R. 62). Together, this evidence, which the ALJ himself cited in his opinion, adequately explains why the ALJ declined to add more restrictive limitations related to Claimant's stability and weakness. The Court is satisfied here that the ALJ supported his conclusions with substantial evidence and was not patently wrong in his credibility analysis of Claimant's subjective symptom statements regarding the same. *Miller v. Colvin*, 2015 WL 1915658, at *5-6 (N.D. Ill. 2015); *see also, Davis v. Colvin,* 2016 WL 278859, at *8 (N.D. Ill. 2016) (giving deference to the ALJ's determination that the claimant's testimony of left-sided weakness and cane use was not credible and therefore did not need to be incorporated into the RFC).

Claimant's argument that the ALJ failed to accommodate her subjective testimony that she required a cane to ambulate is not convincing. While is true that an ALJ's failure to address a claimant's need to use a cane may require remand, *Thomas v. Colvin,* 534 F. App'x 546, 550 (7th Cir. 2013), that is not what happened here. The ALJ did not ignore Claimant's testimony that she needed to use a cane, but in fact specifically considered it in his opinion. (R. 20); *Id.* at 550 ("The

error in this case, however, is not that the medical evidence required the ALJ to find that Thomas needed a cane to stand and walk, but that the ALJ failed to consider the issue at all, leaving us without a finding to review."). And when the ALJ considered Claimant's need to use a cane, he found that Claimant's testimony on that point was not consistent with the medical and other evidence in the record such that it was necessary to specifically incorporate that restriction into the RFC more than he did. (R. 20, 69).

Claimant's treatment notes showed that she could ambulate consistent with the restrictions provided in the RFC and that she had a normal gait, (R. 422, 618), and Claimant's own testimony about her need to use a cane was ambiguous. Although she brought her cane to the hearing and testified that she has a hard time walking, when asked by the ALJ whether she "always use[s] a cane," Claimant replied: "I do have a cane because I'm not able to walk really well with this leg." (R. 69). Based on this testimony and the other evidence in the record about Claimant's ambulatory limitations, the ALJ, to some degree but not to the degree Claimant would like, did account for Claimant's ambulatory limitations when he restricted her ability to climb ladders, frequently negotiate stairs, and balance, stoop, crouch, kneel, or crawl and also provided time restrictions on her sitting and/or standing during a typical eight-hour work day. (R. 19). Given this testimony and based on the Court's own review of the ALJ's explanation and evidence in the record, the ALJ's determination is entitled to some deference and was supported by substantial evidence. For that reason, and because the ALJ created a logical bridge between the relevant evidence and his RFC determination to properly support his conclusions regarding Claimant's physical limitations, the Court finds the ALJ did not err here.

### III.    Claimant's Subjective Allegations

Finally, Claimant asserts that the ALJ improperly weighed Claimant's subjective symptom allegations. Specifically, Claimant asserts that the ALJ used the wrong standard in evaluating Claimant's subjective testimony about her limitations and further failed to explain how Claimant's activities of daily living were inconsistent with the objective medical evidence. (R. 13). Claimant characterizes the ALJ's use of the phrase "not entirely consistent" as "meaningless boilerplate," and insists that "even discussion of a claimant's allegations under the ambit of the 'not entirely consistent' standard must result in remand." [ECF No. 16] at 14 (citing *Farley v. Berryhill*, 314 F.Supp.3d 941, 946 (N.D. Ill. 2018); *Bancolita v. Berryhill*, 2018 WL 2731227, at *4 (N.D. Ill. 2018)). Because Claimant's argument cherry-picks the phrase "not entirely consistent" and ignores the ALJ's fulsome discussion of whether Claimant's allegations can reasonably be accepted as consistent with the objective medical evidence and other evidence under 20 C.F.R. § 416.929(a), the Court rejects this argument.

An ALJ's evaluation of a claimant's subjective allegations will be upheld unless it is "patently wrong." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support."). "SSR 96–7p provides a two-step test for adjudicators to follow when evaluating a claimant's symptoms such as pain." *Maske v. Astrue*, 2012 WL 1988442, at *11 (N.D. Ill. 2010). First, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96–7p., 61 Fed. Reg. at 34484. Second, if there is such an impairment, "the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability

20

to do basic work activities." *Id.* at 34485. The ALJ must justify his or her subjective symptom evaluation with "specific reasons supported by the record," *Pepper v. Colvin,* 712 F.3d 351, 367 (7th Cir. 2013), and in doing so, must consider several factors, including the objective medical evidence, the claimant's daily activities, his level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, *7-8 (Oct. 25, 2017).

The ALJ in this case was not patently wrong in his assessment of Claimant's subjective symptom statements. Even though the ALJ used the boilerplate "not entirely consistent" language that is sometimes criticized by the Seventh Circuit, his fulsome explanation for how Claimant's statements were weighed renders the use of this language benign under the circumstances of this case. *Clemente A. v. Saul*, 2019 WL 3973117, at *3 (N.D. Ill. 2019) (collecting cases; noting that the Seventh Circuit has upheld similar boilerplate language so long as ALJ's decision is fully explained). The ALJ considered all Claimant's subjective allegations but determined that while Claimant's medically determinable impairments "could reasonably be expected to cause the alleged symptoms," Claimant's allegations of disability were not consistent with the weight of evidence in the record. (R. 21).

In support of his conclusion, the ALJ provided several specific, valid reasons – all of which were supported by substantial evidence in the record – for not fully crediting Claimant's subjective symptom statements. First, the objective medical evidence and Claimant's daily activities did not corroborate her subjective symptom statements. SSR 16-3p, 2017 WL 5180304, at *5 ("[O]bjective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms."); *Jeske v. Saul*, 2020 WL 1608847, at *8 (7th Cir. 2020) ("agency regulations instruct that, in an assessment of a claimant's

symptoms, the evidence considered includes descriptions of daily-living activities."). As the ALJ explained, the objective medical evidence showed that although Claimant had been hospitalized four times since her alleged disability onset date, Claimant's degree of physical impairment was not as persistent or acute as she alleged. Her records showed normal neurological function and a normal range of motion in her extremities, (R. 21), and she consistently demonstrated full strength in her left upper arm despite her subjective complaints to the contrary.

Beyond just the objective medical evidence, the ALJ also cited Claimant's routine and conservative courses of treatment as evidence that the severity of symptoms she alleged was incongruous with the weight of the record, as well as the fact that Claimant's daily activities support the same conclusion. Despite her limitations, Claimant was able to clean, sweep, cook, take public transportation independently, maintain friendships, walk ten blocks at a time, travel to Mexico and Idaho, and take care of the cattle on her nephew's farm for several months. (R. 21-22); *Adams v. Astrue,* 880 F. Supp. 2d 895, 907 (N.D. Ill. 2012) (the ALJ properly considered the claimant's daily activities, which included performing household chores and using public transportation, in determining the extent of Claimant's alleged symptoms); *Ortega v. Berryhill*, 2018 WL 4144636, at *5 (N.D. Ill. 2018) ("Nevertheless, it was permissible for the ALJ to generally consider how Plaintiff's ability to travel would undermine his credibility."); *see also,* 20 C.F.R. § 404.1529(c)(3)(i) (explaining that other evidence, including daily activities, is an "important indicator of the intensity and persistence of [claimants] symptoms."). And although Claimant suggests that the ALJ failed to explain "how those marginal activities were inconsistent with her stroke symptoms" and improperly equated these activities with an ability to work full-time, [ECF No. 16] at 16, the Court is unconvinced. The ALJ did not equate Claimant's activities with full-time work, but instead, considered these activities of daily living and reasonably

concluded that they failed to show Claimant was disabled under the law. *Burmester*, 920 F.3d at 510 ("The ALJ did not equate Burmester's ability to perform certain activities of daily living with an ability to work full time. Instead, he used her reported activities to assess the credibility of her statements concerning the intensity, persistence, or limiting effects of her symptoms consistent with the applicable rules.").

Ultimately, "the ALJ must explain her [subjective symptom evaluation] in such a way that allows [the Court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (internal quotations omitted). The ALJ did so here by providing detailed reasons for his credibility finding that were supported by the record as a whole. His ALJ's credibility determination that Claimant's subjective symptom statements were inconsistent with the medical evidence, her doctors' opinions, and her daily activities therefore did not lack "any explanation or support" and was not "patently wrong." *Elder*, 529 F.3d at 413-14.

## CONCLUSION

Claimant's Motion for Summary Judgment [ECF No. 16] is granted for the limited purpose discussed above and denied as to all other claims of error. The Commissioner's Motion [ECF No. 22] is granted in part and denied in part.

It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated:   November 10, 2020